UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

STANACARD, LLC,

                Plaintiff,          08 Civ. 4859

    -against-               OPINION

REBTEL NETWORKS, AB, and REBTEL
MOBILE, INC.,

                Defendants.

------------------------------------X



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-6-10

A P P E A R A N C E S:

    Attorneys for Plaintiff

    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, NY 10166-4193
    By:  Scott R. Samay, Esq.
        Jason S. Charkow, Esq.

    35 W. Wacker Drive
    Chicago, IL 60601-9703
    By:  Peter C. McCabe III, Esq.
        W. Gordon Dobie, Esq.

    Attorneys for Defendants

    ROPES & GRAY LLP
    1211 Avenue of the Americas
    New York, NY 10036
    By:  Jesse J. Jenner, Esq.
        Ching-Lee Fukuda, Esq.
        Todd M. Simpson, Esq.

**Sweet, D.J.**

Plaintiff Stanacard, LLC ("Plaintiff" or "Stanacard") brings this action against defendants Rebtel Networks, AB and Rebtel Mobile, Inc. (collectively, "Defendants" or "Rebtel") alleging infringement of 17 claims of U.S. Patent No. 7,346,156 ("the '156 Patent"): claims 1-4, 6-8, 12, 14, 15, 18, 20-22, 25, 30, and 35 (collectively, the "claims-in-suit").

Pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the parties have submitted briefing regarding their proposed construction of disputed terms contained within the '156 Patent. Rebtel has also moved for summary judgment on the grounds that the asserted claims of the '156 Patent are invalid for indefiniteness.

Upon the facts and conclusions set forth below, the Rebtel's motion for summary judgment is denied. The Court's construction of the disputed terms is set forth below.

# I. PRIOR PROCEEDINGS

On May 23, 2008, Rebtel filed its complaint alleging infringement of the '156 Patent.

On August 15, 2008, Rebtel filed its answer and counterclaims, denying infringement and seeking a declaratory judgment of noninfringement and invalidity of the '156 Patent for failure to satisfy the requirements of 35 U.S.C. §§ 102, 103, and/or 112.

On June 4, 2009, the Court held a Markman hearing to address issues of construction of certain claim terms of the '156 Patent.

Defendants' motion for summary judgment was marked fully submitted on September 2, 2009.

# II. THE FACTS

The facts as set forth below are taken from Rebtel's Statement of Material Facts in Support of Its Motion for Summary Judgment of Invalidity of the '156

Patent Due to Indefiniteness and Stanacard's Reply to Rebtel's Statement of Material Facts.

The '156 Patent is entitled "Methods and Apparatuses for Placing a Telephone Call" and involves technology designed to simplify and reduce the cost of making long distance and international calls. Calling cards have traditionally been utilized to allow callers to place telephone calls at a lower rate than calls placed using traditional telephone companies. However, using calling cards requires dialing several numbers, including a toll free number, a pin number, and the number of the party the caller is trying to reach.

The '156 Patent describes a system of making reduced-cost long distance or international calls while only requiring a caller to remember and dial a single local telephone number. This local telephone number, along with the telephone number from which a call is made, is associated with a recipient's telephone number. As a result, a caller dialing the local telephone number is connected to the recipient as if the caller had dialed the recipient's actual

3

telephone number. For instance, a caller in New York City could be provided or select the telephone number (212) 555-2222 to call his mother in England, the recipient at 011 44 1 11 11 11 11. When the caller dials (212) 555-2222, the caller is connected to his mother in England.

In order to make such a design economically feasible, the system is designed so that callers share the local telephone numbers provided to place their calls. As a result, many different users use the same dial-in number (such as (212) 555-2222) to reach their respective recipients. The system is able to connect each caller to the correct recipient because the recipient's number is selected based on both the telephone number from which the call is being made and the dialed telephone number.

## III. **THE LEGAL FRAMEWORK**

### A. **Claim Construction**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). The language of the patent claim circumscribes the metes and bounds of the patent owner's property right by defining the bounds of the claim scope. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002). "It is the responsibility of patent applicants to disclose their inventions adequately." N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1577 (Fed. Cir. 1993) (citing 35 U.S.C. § 112). "A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent." Id.

Courts are charged with interpreting disputed claim terms of a patent as a matter of law. Markman, 517 U.S. at 384-85. However, "district courts are not (and should not be) required to construe every limitation present in a patent's

5

asserted claims," O2 Micro Int'l Ltd. v. Beyond
Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir.
2008), and district courts routinely decline to
interpret claim terms where the terms sought to be
defined by a party are readily understood. See, e.g.,
Advanced Software Design Corp. v. Fiserv, Inc., No.
4:07cv185, 2008 U.S. Dist. LEXIS 103669, at *29 (E.D.
Mo. Dec. 23, 2008) (finding terms "print" or
"printing" and "match" to have their plan and ordinary
meaning as understood by someone in the art at the
time of the invention); Level 3 Commc'n, LLC v.
Limelight Networks, Inc., 589 F. Supp. 2d 664, 686-88
(E.D. Va. 2008) (refusing to adopt definitions for the
terms "obtain[ing]," "determine" and related phrases
because they each had a plain and ordinary meaning);
Parker-Hannifin Corp. v. Baldwin Filters, Inc., No.
1:07-cv-1709, 2008 U.S. Dist. LEXIS 108152, at *38
(N.D. Ohio July 3, 2008) (finding the words
"surrounding and defining" required no construction
and should be given their plain and ordinary meaning);
Caddy Prods. Inc. v. Am. Seating Co., Civil No. 05-800
(JRT/FLN), 2008 U.S. Dist. LEXIS 29130, at *24 (D.
Minn. Apr. 4, 2008) (finding ordinary meaning of terms
"engaging" and "enclosing" required no definition);

WIMCO, LLC v. Lange Indus., Inc., No. 06-CV-3565
(PJS/RLE), 2007 U.S. Dist. LEXIS 92502, at *10-11 (D.
Minn. Dec. 14, 2007) (refusing to construe term
"filtered drain from the erosion control basin,"
because "[t]he words in this term are ordinary words,
used in their ordinary sense, and any further
definition or paraphrasing would serve no useful
purpose").

In interpreting the meaning of claim terms,
"words of a claim 'are generally given their ordinary
and customary meaning'" to a person of ordinary skill
in the art at the time of invention (i.e., the
effective filing date of the patent application).
Phillips, 415 F.3d at 1312-13 (citations omitted).
"Importantly, the person of ordinary skill in the art
is deemed to read the claim term not only in the
context of the particular claim in which the disputed
term appears, but in the context of the entire patent,
including the specification." Id. at 1313. Thus, the
Federal Circuit has emphasized the importance of
"intrinsic" evidence in claim construction: the words
of the claim themselves, the written description in
the patent's specification, and, when necessary, the

7

history of the patent application's prosecution before the U.S. Patent and Trademark Office. Id. at 1314-17.

The process of claim construction begins with the language of the claims themselves. The language of the claim is what the patentee chose to use to "'particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention.'" Id. at 1311-12 (quoting 35 U.S.C. § 112, ¶ 2). Thus, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at 1314. In addition to the particular claim being examined, the context provided by other claims may be helpful as well. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Id. at 1314-15.

Claim language must also be read in the context of the specification. Id. at 1315. As the Federal Circuit has made clear, "claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally

8

of a specification that concludes with the claims."
Id. (quoting Markman, 52 F.3d at 978). "For that
reason, claims 'must be read in view of the
specification, of which they are a part.'" Id.
(quoting Markman, 52 F.3d at 979). The specification
"is always highly relevant to the claim construction
analysis. Usually it is dispositive; it is the single
best guide to the meaning of a disputed term." Id.
(quoting Vitronics Corp. v. Conceptronic, Inc., 90
F.3d 1576, 1582 (Fed. Cir. 1996)). Moreover, when the
patentee "'act[s] as his or her own lexicographer'"
and includes an explicit definition of a claim term in
the specification, that definition is dispositive over
any ordinary meaning. Id. at 1319 (citation omitted);
see also Digital Biometrics, Inc. v. Identix, Inc.,
149 F.3d 1335, 1344 (Fed. Cir. 1998) ("The written
description is considered, in particular to determine
if the patentee acted as his own lexicographer, as our
law permits, and ascribed a certain meaning to those
claim terms.").

    In relying on the specification to interpret
claim terms, the Federal Circuit has also "repeatedly
warned against confining the claims" to the

embodiments described in the specification.  Phillips,
415 F.3d at 1323.  The mistake of "reading a
limitation from the written description into the
claims" is "one of the cardinal sins of patent law."
Id. at 1320 (quoting SciMed Life Sys., Inc. v.
Advanced Cardiovascular Sys., Inc., 242 F.3d 1337,
1340 (Fed. Cir. 2001)).

Courts may also utilize the prosecution
history which "consists of the complete record of the
proceedings before the PTO and includes the prior art
cited during the examination of the patent . . . .
[T]he prosecution history can often inform the meaning
of the claim language by demonstrating how the
inventor understood the invention and whether the
inventor limited the invention in the course of
prosecution, making the claim scope narrower than it
would otherwise be."  Id. at 1317 (citations omitted).
However, the prosecution history  "often lacks the
clarity of the specification and thus is less useful
for claim construction purposes."  Id.

Lastly, courts may rely on extrinsic
evidence such as dictionaries, learned treatises, and

10

expert testimony, which may serve to provide a source
of "accepted meaning of terms used in various fields
of science and technology," or by providing
"background on the technology at issue." Id. at 1317-
18. However, such "extrinsic" evidence is "less
significant than the intrinsic record in determining
the legally operative meaning of the claim language."
Id. at 1317 (internal citations and quotation marks
omitted). The use of extrinsic evidence may not be
used to contradict the meaning of the claim terms as
evidenced by the intrinsic evidence. Id. at 1317-19;
see also Biagro W. Sales, Inc. v. Grow More, Inc., 423
F.3d 1296, 1302 (Fed. Cir. 2005).

## B.    Indefiniteness

        Patent limitations function to put the
public on notice of the metes and bounds of an
invention. A patent limitation must describe the
invention with sufficient clarity for the public,
including the patentee's competitors, to determine
whether or not the patent is infringed. Warner-
Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17,
28-29 (1997). Consequently, the law requires claims

to "particularly point[] out and distinctly claim[]
the subject matter which the applicant regards as his
invention." 35 U.S.C. § 112, ¶ 2.

To rule "on a claim of patent
indefiniteness, a court must determine whether those
skilled in the art would understand what is claimed
when the claim is read in light of the specification."
Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359
F.3d 1367, 1371 (Fed. Cir. 2004) (citations omitted).
A claim limitation that is not amenable to
construction is indefinite and invalid as a matter of
law.  Exxon Research & Eng'g Co. v. United States, 265
F.3d 1372, 1375 (Fed. Cir. 2001).  Given the patent's
presumption of validity, see 35 U.S.C. § 282, however,
a court should hold a claim indefinite only after
reasonable efforts at construction prove futile.
Exxon Research, 265 F.3d at 1375.  If the claim's
meaning is discernable, "even though the task may be
formidable and the conclusion may be one over which
reasonable persons will disagree," the claim is
"sufficiently clear to avoid invalidity on
indefiniteness grounds."  Id.  Thus "[o]nly claims not
amendable to construction or insolubly ambiguous are

indefinite" and thus invalid. Datamize LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005) (quotation marks and citation omitted). A party must show invalidity for indefinites by clear and convincing evidence, and close questions of indefinites "are properly resolved in favor of the patentee." Exxon Research, 265 F.3d at 1380.

## C.   **Means Plus Function Claims**

"Means plus function" limitations recite a function to be performed without reciting specific structure for performing the function. Instead, the limitation recites a "means" for performing the stated function. Lockheeed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1318 (Fed. Cir. 2003). The patent statute requires that such "means" limitations "must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the claimed function. Id.; 35 U.S.C. § 112, ¶ 6.

In construing a means plus function limitation, a court must identify both the claimed

13

function and the corresponding structure disclosed in the written description that performs that function. See Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006); JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005).

When identifying the claimed function, a court may not construe the function "by adopting a function different from that explicitly recited in the claim." JVW, 424 F.3d at 1331 (internal quotations marks and citation omitted). "Correctly identifying the claimed function is critical, because 'an error in identification of the function can improperly alter the identification of the structure . . . corresponding to that function.'" ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1087 (Fed. Cir. 2003) (citation omitted).

Once the function is properly identified, the patent's specification must next be examined to determine the corresponding structure disclosed by the patent that performs the identified function. See Applied Med., 448 F.3d at 1332. "Under this second

step, 'structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" Med. Instrumentation & Diagnostics Corp. v. Eketa AB, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citation omitted). "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1298 (Fed. Cir. 2005). If no structure for performing the claimed function is disclosed, the claim is invalid for indefiniteness. See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1114 (Fed. Cir. 2002).

### D.   **Summary Judgment**

Summary judgment may only be granted when there is "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In considering

15

a motion for summary judgment, "[t]he Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor." Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co., 589 F. Supp. 2d 314, 319 (S.D.N.Y. 2008) (citing Tufariello v. Long Island R.R. Co., 458 F.3d 80, 85 (2d Cir. 2006)). "A party seeking summary judgment bears the burden of establishing that no genuine issue of material facts exists." Id. If the moving party has made "a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact," then the nonmoving party must present evidence that would be sufficient to support a jury verdict in the nonmoving party's favor. See id. (citing Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).

## IV. THE DISPUTED LIMITATIONS

The parties dispute the definition of the following claim terms found in all of the claims-in-suit: "telephone number;" "assigned incoming telephone number;" "recipient;" "associated with;" "wherein said

caller has a plurality of assigned incoming telephone numbers to choose from;" "without input of further data by said caller;" and "whereby said caller is not required to be within a particular network for making calls." The parties also dispute the definition of the term "a local calling area of the caller," found in claims 8 and 20, and "originating telephone number assigned to the caller," found in claim 18.

The parties further dispute the definition of several "module"-based terms found in claims 15, 18, 20, and 35: "an originating telephone number module for identifying an originating telephone number of a caller;" "a telephone number detection module for detecting an assigned telephone number dialed by the caller;" and "a call connection module for connecting the caller with a recipient based on the assigned telephone number and the originating telephone number" (collectively, the "module limitations"). Finally, the parties also dispute several terms found in claims 14 and 30 that identify the means for accomplishing various tasks: "means for detecting an identity of a caller;" "means for receiving an assigned incoming telephone number;" "means for identifying a recipient

associated with the assigned incoming telephone number and the identity;" and "means for connecting the caller and the recipient (collectively, the "means limitations").

Rebtel asserts that the terms "assigned incoming telephone number," "whereby said caller is not required to be within a particular network for making calls," and "a local calling area of the caller" are indefinite and that the claims containing the terms are therefore invalid. Because these terms are found in the three independent claims-in-suit upon which all of the dependent claims-in-suit rely, Rebtel seeks summary judgment of invalidity of all of the claims-in-suit.

In addition, Rebtel asserts that the claims-in-suit containing either the module limitations or the means limitations are indefinite for failing to disclose a corresponding structure as required by 35 U.S.C. § 112, ¶ 6.

Independent claim 1 of the '156 Patent recites as an invention:

A method comprising:
detecting an identity of a caller;
receiving an assigned incoming telephone number;
identifying a recipient associated with the assigned incoming telephone number and the identity; and
connecting the caller and the recipient, wherein said caller has a plurality of assigned incoming telephone numbers to choose from, at least one of said plurality of assigned incoming telephone numbers being associated with said recipient, wherein each assigned incoming telephone number is associated with multiple recipient telephone numbers, a particular telephone number of a recipient being determined solely by a particular assigned incoming telephone number used by a particular identified caller and without input of further data by said caller, whereby said caller is not required to be within a particular network for making calls.

Independent claim 14 of the '156 Patent

recites as an invention:

A system comprising:
means for detecting an identity of a caller;
means for receiving an assigned incoming telephone number,
means for identifying a recipient associated with the assigned incoming telephone number and the identity; and
means for connecting the caller and the recipient, wherein said caller has a plurality of assigned incoming telephone numbers to choose from, at least one of said plurality of assigned incoming telephone

19

numbers being associated with said
recipient,
wherein each assigned incoming telephone
number is associated with multiple recipient
telephone numbers, a particular telephone
number of a recipient being determined
solely by a particular identified caller and
without input of further data by said
caller, whereby said caller is not required
to be within a particular network for making
calls.


Independent claim 15 of the '156 Patent

recites as an invention:


A system comprising:
an originating telephone number module for
identifying an originating telephone number
of a caller;
a telephone number detection module for
detecting an assigned telephone number
dialed by the caller; and
a call connection module for connecting the
caller with a recipient based on the
assigned telephone number and the
originating telephone number,
wherein said caller has a plurality of
assigned incoming telephone numbers to
choose from, at least one of said plurality
of assigned incoming telephone numbers being
associated with said recipient,
wherein each assigned incoming telephone
number is associated with multiple recipient
telephone numbers, a particular telephone
number of a recipient being determined
solely by a particular assigned incoming
telephone number used by a particular
identified caller and without input of
further data by said caller, whereby said
caller is not required to be within a
particular network for making calls.

20

The remaining claims-in-suit are dependent on claims 1, 14, and 15: claims 2-4, 6-8, 12, 21, 22, 25 are dependent on claim 1; claim 30 is dependent on claim 14; and claims 18, 20, and 35 are dependent on claim 15. These dependent claims recite additional features of the claimed system and methods.

Dependant claim 8 recites as an invention:

The method according to claim 1 wherein the recipient is located outside of a local calling area of the caller.

Dependant claim 18 recites as an invention:

The system according to claim 16 wherein the profile information includes the originating telephone number assigned to the caller.

Dependent claim 16, which is not alleged have been infringed by Rebtel, is in turn dependent on claim 15.

Dependant claim 20 recites as an invention:

The system according to claim 15 wherein the recipient is located outside the local calling area of the caller.

## A.    "telephone number"

Stanacard proposes that the term "telephone number" be given its plain and ordinary meaning. Rebtel proposes that the term be defined as "a series of alphanumeric characters, that may vary in length, used to route telephone calls." According to Rebtel, advances in telecommunications technology as well as the various alphanumeric forms a "telephone number" may take requires the adoption of its proposed definition.

"Telephone number" is a simple and widely used term, and there is no indication that the inventors intended to use the term differently from its commonly understood meaning among persons of skill in the art. Rebtel's proposed definition serves only to introduce additional terms into the claim and would result in confusion for the jury. See Am. Patent Dev. Corp. v. Movielink, LLC, 604 F. Supp. 2d 704, 716 (D.

Del. 2009) (refusing to adopt a construction which was
"merely a verbose paraphrasing of claim language that
otherwise offers little to assist one of skill in the
art in understanding the claims"); Parker-Hannifin,
2008 U.S. Dist. LEXIS 108152, at *38 (providing no
construction for words which should be readily
understood by a jury and where defendant's
constructions merely offered synonyms for the claim
terms); WIMCO, 2007 U.S. Dist. LEXIS 92502, at *11
(providing no claim construction for a term where "any
further definition or paraphrasing would serve no
useful purpose.").

Consequently, "telephone number" is given
its plain and ordinary meaning.

## B.  "assigned incoming telephone number"

Stanacard proposes that the term "assigned
incoming telephone number" either be given its plain
and ordinary meaning or, to the extent it must be
defined, be given the definition "telephone number
assigned to initiate calls into a system."  Rebtel
argues that the term is indefinite or, to the extent

23

it may be defined, should be given the definition
"telephone number preprogrammed by a caller to
correlate to a recipient."

Rebtel has argued that "assigned incoming
telephone number" is indefinite because it does not
specify whom or what does the assigning nor does it
specify to whom or what the number is assigned.
However, there is no requirement that the claim be
limited in this manner, and "[w]ho or what performs
claimed method steps is generally irrelevant to claim
scope." Alcatel USA Sourcing, Inc. v. Microsoft
Corp., No. 6:06 CV 499, 2008 U.S. Dist. LEXIS 64351,
at *24 (E.D. Tex. Aug. 21, 2008) (finding that "while
the specification discloses that a user enters the
first user identification information, the disclosed
embodiments do not require a user to perform that
method step").

Rebtel's proposed construction seeks to
introduce the phrase "preprogrammed by a caller."
However, the term "preprogrammed" is not found
anywhere in the specification or the prosecution
history, and the only use of a variant of

24

"preprogrammed" is in a single passage in the
specification that states "[f]or example, the caller
programs the system 300 to connect with a particular
recipient when the caller dials one of the assigned
incoming telephone numbers." '156 Patent, col. 4:21-
23.  This reference provides only a single example of
the claimed invention, and it would be improper to
limit the claims to a preferred embodiment disclosed
in the specification.  See Phillips, 415 F.3d at 1323;
Chamberlain Group, Inc. v. Lear Corp., 516 F.3d 1331,
1335 (Fed. Cir. 2008); Amgen Inc. v. Hoechst Marion
Roussel, Inc., 314 F.3d 1313, 1325 (Fed. Cir. 2003).

          Rebtel's proposed construction also seeks to
incorporate "correlate to a recipient" into the claim
term.  As the specification and the claims make clear,
the existence of a correlation between a telephone
number dialed by the caller and a particular recipient
is at the heart of the claimed invention.  See, e.g.,
'156 Patent, col. 3:45-48; 5:32-34.  Moreover,
including the phrase "correlate to a recipient" serves
to clarify that the "assigned incoming telephone
number" is the number dialed by the caller that is
associated with a recipient and not, e.g., the number

assigned by the telephone company from which a caller dials.

Stanacard argues that the inclusion of the phrase "correlate to a recipient" would render the subsequent claim element "identifying a recipient associated with the assigned incoming telephone number" superfluous because both capture the concept of an association between an assigned number and a recipient. However, the phrase "correlate to a recipient" serves only to describe the nature of the incoming telephone number; it does not set forth the separate act, described in the subsequent claim element, of "identifying a recipient" to which the number is correlated.

"[A]ssigned incoming telephone number" is not "insolubly ambiguous," Datamize, 417 F.3d at 1347, and is therefore construed to mean "telephone number correlating to a recipient assigned to initiate calls into a system."

C.      **"recipient"**

Stanacard proposes that "recipient" be given its plain and ordinary meaning. Rebtel seeks to define "recipient" as a "person, or device or address associated with the person, which the caller is attempting to connect" on the grounds that it is necessary to clarify that a recipient is not limited to a person, but may include various devices or addresses associated with a person.

Like "telephone number," recipient is a commonly used and understood term that does not require a lengthy definition that would only serve to confuse the jury. Moreover, although the parties agree that "recipient" would include not only people, but also entities and businesses, Rebtel's specific reference to a "person" or "items associated with a person" in its proposed definition would imply that certain non-person entities are excluded from the scope of the term "recipient" as used in the '156 Patent.

"Recipient" is therefore given its plain and ordinary meaning.

**D.     "associated with"**

Stanacard proposes that "associated with" be given its plain and ordinary meaning, while Rebtel argues that "associated with" be given the definition "preprogrammed by the caller to correlate to."

Rebtel argues that given the computerized context of the claimed invention, the association between the incoming telephone number and the recipient number must, in fact, be "preprogrammed." Further, Rebtel asserts that because the specification only discloses embodiments in which the caller preprograms the system, the claims are properly limited to the single disclosed embodiment. See, e.g., Toro Co. v. White Consolidated Indus., Inc., 199 F.3d 1295, 1301-02 (Fed. Cir. 1999); Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1316 (Fed. Cir. 2007).

However, the specification, including the passages cited by Rebtel, do not establish that "associated with" has the same meaning as "preprogrammed." See Vitronics, 90 F.3d at 1582.

28

Things can be "associated" with each other by an individual without being preprogrammed by the individual, as the specification of the '156 Patent makes clear. Compare '156 Patent, col. 4:18-23 ("In one embodiment, the call connection module 360 selects a particular recipient based on the profile information associated with the caller. For example, the caller programs the system 300 to connect with a particular recipient when the caller dials one of the assigned incoming telephone numbers.") with col. 7:1-5 ("In another embodiment, the recipient is determined, in part, by the recipient selected by the caller to be associated with the specific assigned incoming telephone number as shown in the recipient field 430 within the caller's profile."). Because the specification discloses embodiments in which the caller may select the recipient of a call without actually engaging in preprogramming the system to dial the selected recipient, it cannot be said that the specification discloses only a single embodiment of the invention in which the caller preprograms the system. As a result, Rebtel's proposed definition would improperly impose a new limitation to the claim term "associated with."

Finally, Rebtel's definition would introduce
unnecessary verbiage to claim language that a jury
would understand.  See Alcatel USA, 2008 U.S. Dist.
LEXIS 64351, at *30-31 (holding that "associating" did
not require construction because "a lay jury will
understand the term").

"Associated with" is given its plain and
ordinary meaning.

**E.    "wherein said caller has a plurality of
        assigned incoming telephone numbers to
        choose from"**

Stanacard proposes that this term be given
its plain and ordinary meaning.  Rebtel proposes the
alternative definition "wherein the caller, when
placing a call, has more than one assigned incoming
telephone number available for use."  Rebtel argues
that its proposed definition provides a temporal
boundary of the scope of the limitation insofar as it
explains that, in the context of this invention, the
caller has more than one assigned incoming telephone

number available to dial when the caller is placing a call.

Rebtel, however, offers no argument for why the existing claim language would be confusing to a jury or otherwise requires rewording. Moreover, its proposed definition introduces further confusion insofar as it introduces the undefined temporal restriction "when placing a call." This claim term is therefore given its plain and ordinary meaning. See Am. Patent Dev., 604 F. Supp. 2d at 716 (rejecting plaintiff's proposed claim construction as a "paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims.").

## F. "without input of further data by the caller"

Stanacard proposes that this claim term be given its plain and ordinary meaning. Rebtel seeks to assign the term the definition "in order to connect to the recipient, the caller is not required to enter any information other than the assigned incoming telephone number."

The parties do not appear to disagree that
the term indicates that once the claimed system
possesses both the caller's identity (through the
caller's telephone number) and the number being dialed
(the assigned incoming telephone number), the caller
is not required to enter any additional information.
The existing claim language succinctly conveys this
idea, and Rebtel offers no compelling reason for the
adoption of its much lengthier definition. See id.

## G. "whereby said caller is not required to be within a particular network for making calls"

Stanacard argues that this term should be
given its plain and ordinary meaning or, in the
alternative, be construed to mean "whereby the caller
is not required to use any particular type of network
such as private branch exchange, landline, mobile, or
Internet."

Rebtel argues that this claim language is
insolubly ambiguous, and therefore invalid, on the
grounds that the '156 Patent fails to define with

sufficient specificity what constitutes a "network."
As a result, Rebtel argues, a party cannot know
whether or not it is "within a particular network for
making calls."

The point of this claim limitation, however,
is not to require that a caller be situated within a
particular type of network. Rather, it states the
opposite - that what is claimed is an open system that
does not restrict the caller to any specific network
when calling into the claimed system. See '156
Patent, col. 1:29-31 ("In addition, a calling card
caller is typically able to utilize any telephone
within a general geographic area to complete the
telephone call . . .". This is consistent with
Stanacard's arguments before the patent examiner, in
which it distinguished the claimed invention over the
Bedingfield reference by noting that the claimed
invention did not require that the caller be within a
particular network for making calls. See '156 Patent
File History, Comments on Stmt of Reasons for
Allowance, Jan. 11, 2008, at 1. Moreover, the
specification makes clear that this claim limitation
refers to events occurring prior to the caller's

connection with the claimed system and does not encompass the utilization of either Stanacard or Rebtel's "networks." See, e.g., '156 Patent, col. 2:22-26 ("The environment includes an electronic device 111 (e.g. a land line telephone, a cellular telephone, a satellite telephone, and the like), a caller interface 115, a network 120 (e.g., a local area network, a home network, the Internet, telephone network) . . . ."); Fig. 1.

The claim language, read in the context of the specification's disclosure, establishes that this limitation excludes from claimed material any system that restricts the caller to a specific network, of any type, when dialing the assigned incoming telephone number and placing a call into the claimed system. Because the claim language conveys the meaning of this limitation, no construction is required and "whereby said caller is not required to be within a particular network for making calls" is given its plain and ordinary meaning.

**H.** **"a local calling area of the caller"**

Stanacard argues that this term should be given its plain and ordinary meaning or, in the alternative, be defined as "a calling area where a caller does not incur long distance or toll charges when making a call." Rebtel asserts that this claim term is insolubly ambiguous and therefore indefinite.

The specification explains that the "local calling area of the caller" is one in which "the caller does not incur long distance or toll charges." '156 Patent, col. 7:50-51. Thus, the "local calling area of the caller" is tied to whether additional charges are incurred by the caller in dialing into the claimed system. This is consistent with the goal of the claimed invention to capture one of the benefits of calling cards – namely, placing calls without incurring toll charges. See '156 Patent, col. 1:29-32.

Rebtel notes that depending on a caller's calling plan, the local calling area may include the entire nation, or even the entire world. While those circumstances may render Stanacard's claimed invention useless insofar as it may not provide any monetary or

convenience benefits, it does not render the disputed
claim term meaningless or indefinite.

For the foregoing reasons, the term "a local
calling area of the caller" is defined as "a calling
area where a caller does not incur long distance or
toll charges when making a call."

### I. "originating telephone number assigned to the caller"

Stanacard argues that the term should be
given its plain and ordinary meaning or, in the
alternative, be construed to mean "telephone number
given to a caller from which the caller initiates a
call." Rebtel seeks to define this term to mean
"telephone number preprogrammed by the caller to
correlate to the caller."

By the words of the claim term itself, the
originating telephone number is one assigned "to the
caller," meaning that it is a number assigned by
someone else to the caller. The specification also
explains that the "originating telephone number" is

36

the phone number from which the caller initiated or placed the call. See '156 Patent, col. 3:54-56, 5:22-24, 6:43-48. The originating telephone number is thus the caller's own telephone number which was provided by the caller's telephone company. This is properly reflected in Stanacard's proposed alternate definition, "telephone number given to a caller from which the caller initiates a call."

Rebtel's definition attempts to introduce the requirement that the originating number is one that must be "preprogrammed by the caller" to be associated with his or her account in the system. As discussed supra in Sections IV.B & D, the introduction of the "preprogrammed" language into the claim definition would improperly limit the scope of the claim. Nor does the lack of disclosure of how, when, and by whom the number is assigned require the adoption of Rebtel's proposed definition.

The claim limitation "originating telephone number assigned to the caller" is therefore defined to mean "telephone number given to a caller from which the caller initiates a call."

**J.    The Module Limitations**

The parties dispute whether the module
limitations found in claims 15, 18, 20, and 35 of the
'156 Patent should be treated as "means plus function"
limitations subject to 35 U.S.C. § 112, ¶ 6.  A claim
limitation that does not use the word "means" triggers
a rebuttable presumption that § 112, ¶ 6 does not
apply.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d
1359, 1369 (Fed. Cir. 2002) (citing Personalized Media
Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 704
(Fed. Cir. 1998)).  This presumption may be rebutted
by demonstrating that the disputed claim term fails to
"recite sufficiently definite structure" or else
recites "function without sufficient structure for
performing that function."  See id. (quoting Watts v.
XL Sys., Inc., 232 F.3d 877, 880 (Fed. Cir. 2000)).
"What is important is whether the term is one that is
understood to describe structure, as opposed to a term
that is simply a nonce word or a verbal construct that
is not recognized as the name of the structure and is
simply a substitute for the term 'means for.'"
Lighting World, Inc. v. Birchwood Lighting, Inc., 382

F.3d 1354, 1360 (Fed. Cir. 2004). However, the
Federal Circuit has also observed:

> In considering whether a claim term recites
> sufficient structure to avoid application of §
> 112, ¶ 6, we have not required the claim term to
> denote a specific structure. Instead, we have
> held that it is sufficient if the claim term is
> used in common parlance or by persons of skill in
> the pertinent art to designate structure, even if
> the term covers a broad class of structures and
> even if the term identifies the structures by
> their function.

Id. at 1359-60 (citing Greenberg v. Ethicon Endo-
Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

Numerous cases demonstrate that the term
"module," in the context of the telecommunications
field, denotes sufficient structure such that § 112, ¶
6 is not invoked. See, e.g., PalmTop Prods., Inc. v.
Lo-Q PLC, 450 F. Supp. 2d 1344, 1364-65 (N.D. Ga.
2006) (holding that "'[c]ommunications module,' and
even 'module,' represents more than a mere verbal
construct serving as a 'means for' substitute" and
concluding "'module' connotes definite structure, and
when combined with 'communications,' which describes
the module's operation, sufficient structural meaning
will likely be conveyed to a person of ordinary skill

in the art"). Similarly, the court in C2 Commc'ns

Techs., Inc. v. AT&T, Inc. also found, in the context

of a telephone calling system patent, that section §

112, ¶ 6 is not "invoked by the use of the term

'module.'" No. 2:06-CV-241, 2008 U.S. Dist. LEXIS

46942, at *34-35 (E.D. Tex. June 13, 2008) (holding

that "first protocol conversion module" does not

invoke § 112, ¶ 6).


Moreover, in many communications and

computer arts cases, courts have found that a "module"

is the actual structure described in the specification

which corresponds to the function claimed by means

language. See On Demand Mach. Corp. v. Ingram Indus.,

Inc., 442 F.3d 1331, 1340-41 (Fed. Cir. 2006)

(affirming claim construction that found "computer

module" to be the structure for "means for a customer

to visually review said sales information"); Foundry

Networks v. Lucent Techs., Inc., No. 2-04-CV-40, 2005

U.S. Dist. LEXIS 46840, at *21, 22, 24, 25 (E.D. Tex.

May 24, 2005) (finding "voice communication module" to

be the structure for "means for forwarding an incoming

call" limitations); Roche Diagnostics Corp. v. Apex

Biotechnology Corp., 455 F. Supp. 2d 840, 868 (S.D.

Ind. 2005) (finding "a removable and/or reinsertable read-only-memory ('ROM') chip and/or module" to be the structure for "pluggable memory key means" limitation); Alcatel USA, 2008 U.S. Dist. LEXIS 64351, at *52, 56, 60 (finding a processor using a "locator module" to be structure for "means for determining" and "means for identifying" and "device module" and the software executing it to be structure for "means for manipulating each received data or message"); Visto Corp. v. Good Tech, Inc., No. 2:06-CV-039, 2008 U.S. Dist. LEXIS 3244, at *32-34, 37 (E.D. Tex. Jan. 16, 2008) (finding "general synchronization module" to be the structure for "first[/second] means for generating first[/second] examination results from first[/second] version information" and "means for generating;" "synchronization start module" to be the structure for "means for initiating;" and communications module" to be the structure for "means for downloading data"), constructions adopted by Visto Corp. v. Research in Motion, Ltd., No. 2:06-CV-181, 2008 U.S. Dist. LEXIS 35580 (E.D. Tex. Apr. 30, 2008); Autobytel, Inc. v. Dealix Corp., No. 2:04-CV-338, 2006 U.S. Dist. LEXIS 3381, at *24-26 (E.D. Tex. Jan. 18, 2006) (finding "process purchase request module,"

"database access module," "buyer-dealer association module," and "network access module" to be structures for "means for identifying," "means for creating," and "means for communicating").

The terms "originating telephone number module," "telephone number detection module," and "call connection module" would be readily understood by a person of skill in the art based on the functions to be performed. For example, with respect to the "originating telephone number module," the specification states that "[i]n one embodiment, the caller's telephone number is detected by the call identification module 320 through caller ID service. In this embodiment, the caller identification module 320 automatically senses the caller's telephone number though the caller ID service" and "[i]n one embodiment, the caller's telephone number is automatically detected through a caller identification service that supplies the telephone number from which the telephone call is placed." '156 Patent, col. 3:45-61, 6:45-48; Fig. 3. The specification also provides that "[t]he telephone number detection module 310 detects the telephone number dialed by the caller.

In one embodiment, the telephone number dialed by the
caller is an assigned incoming telephone number that
corresponds with a recipient." '156 Patent, col.
3:44-48; Fig. 3. The specification also discloses
that "the call connection module 360 connects the
caller with a particular recipient based on the
identity of the caller, the caller's profile, and the
assigned incoming telephone number dialed by the
caller." '156 Patent, col 4:33-36. Thus,
"originating telephone number module," "telephone
number detection module," and "call connection module"
would be understood by a person skilled in the art to
refer to any of that class of hardware and/or software
components that, respectively, (1) identifies an
originating telephone number; (2) detects a dialed
telephone number; and (3) connects a telephone call.
As a result, § 112, ¶ 6 is not invoked.

        In asserting that the module limitations
should be treated as means plus function limitations
subject to § 112, ¶ 6, Rebtel cites to the Federal
Circuit's holding in Ranpak Corp. v. Storopack, Inc.,
No. 98-1009, 1998 WL 513598 (Fed. Cir. July 15, 1998).
There, the patents-in-suit were directed towards

technology for converting multi-ply paper into pad-like products to be used as cushioning in boxes. The patents contained claims reciting both a "settable control means" as well as a "settable control module." The court concluded that "settable control module" invoked § 112, ¶ 6. Rebtel has also cited to Kozam v. Phase Forward, Inc., No. MJG-04-1787, 2005 WL 6218037, at *6-7 (D. Md. Aug. 29, 2005), in which the court concluded that the terms "first data verification module" and "second data verification module" should be construed the same as "first data verification means" and "second data verification means."

Both cases, however, are distinguishable on their facts. In Ranpak, there was no indication that the term "module" identified a structure as understood by a person of skill in the art. Consequently, the "module" containing claims simply recited the same function described in the "means" containing claims without offering any additional structural description. 2005 WL 6218037, at *6-7 ("[T]he use of the term 'settable control module' invokes [§ 112, ¶ 6], because it merely sets forth the same black box without recitation of structure for providing the same

44

specified function."). In Kozam, the court found that the term "module" referred to a software component of a much larger software program, but failed to describe any meaningful structure. Kozam, 2005 WL 6218037, at *6. Because "module" failed to convey any structural meaning beyond the recitation of its function, the court concluded that the limitations containing "module" should be treated as means plus function limitations subject to § 112, ¶ 6. Id. at *6-7.

In contrast, numerous cases have demonstrated that in the telecommunications context, there exists a well-understood structure associated with the term "module" by those skilled in the art.[1] See, e.g., C2 Commc'ns Techs., 2008 U.S. Dist. LEXIS 46942, at *34-35; Foundry Networks, 2005 U.S. Dist. LEXIS 46840, at *21, 22, 24, 25; Alcatel USA, 2008 U.S. Dist. LEXIS 64351, at *52, 56, 60. As a result, neither Ranpak nor Kozam requires the application of § 112, ¶ 6 to the module limitations of the '156 Patent.

---

[1] Rebtel also argues that the court in Alcatel USA Res. Inc. v. Microsoft Corp., No. 6:06 CV 500, 2008 U.S. Dist. LEXIS 49615 (E.D. Tex. June 27, 2008) found the term "module" to be indefinite. However, the term at issue was "recognition means," which the court identified as being located within a "set-up module." Id. at *38. The court did not find that the "set-up module" term was subject to § 112, ¶ 6 or that it was indefinite.

Consequently, the presumption against subjecting claims lacking the "means" language to the requirements of § 112, ¶ 6 applies, and the module limitations of the '156 Patent should not be treated as means plus function limitations. See CCS Fitness, 288 F.3d at 1369.

### K.    The Means Limitations

In asserting that the means limitations of the '156 Patent are indefinite for failing to disclose a structure as required by § 112, ¶ 6, Rebtel relies on WMS Gaming, Inc. v. International Game Technology, 184 F.3d 1339 (Fed. Cir. 1999) and the related line of Federal Circuit precedent. See Net MoneyIn v. VeriSign, Inc., 545 F.3d 1359 (Fed. Cir. 2008); Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323 (Fed. Cir. 2008); Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328 (Fed. Cir. 2008); Harris Corp. v. Ericsson, Inc., 417 F.3d 1241 (Fed. Cir. 2005).

In WMS Gaming, the patent at issue covered
an electronic slot machine designed to manipulate the
odds of winning by using a mathematical formula,
rather than the natural stop positions of the slot
machine reels, to control the outcome of the game.
The means limitation for assigning numbers to the stop
positions on the reel disclosed, as the corresponding
structure, a microprocessor or computer to control the
slot machine along with an algorithm for assigning
numbers to the various stop positions. WMS Gaming,
184 F.3d at 1347-48. The Federal Circuit held that
the corresponding structure was the algorithm to be
run on the general purpose microprocessor since the
computer, once programmed with the algorithm, "in
effect becomes a special purpose computer once it is
programmed to perform particular functions pursuant to
instructions from program software." Id. at 1348
(quoting In re Alappat, 33 F.3d 1526, 1545 (Fed. Cir.
1994) (en banc)).

Rebtel's indefiniteness argument with
respect to the means limitations of the
'156 Patent is premised on its assertion that the WMS
Gaming line of cases applies to these limitations.

WMS Gaming, however, dealt with the situation in which
the disclosed structure for a means plus function
claim was a general purposes computer or
microprocessor programmed to carry out a mathematical
algorithm.  See id. at 1349.  Subsequent cases
applying WMS Gaming to require disclosure of an
"algorithm" share the common characteristic of dealing
with systems in which algorithms were used to perform
various functions on a general purpose computer or
microprocessor.  See Net MoneyIn, 545 F.3d at 1365
(system for processing credit card transactions over
the Internet and to address security issues utilizing
computer "means for generating an authorization
indicia in response to queries"); Finisar, 523 F.3d at
1340 (information broadcasting system with computer-
based "database editing means . . . for generating a
hierarchically arranged set of indices . . . and for
embedding said indices."); Aristocrat Techs., 521 F.3d
at 1331-33 (electronic slot machine with "game
controls means" "defining a set of predetermined
arrangements for a current came" where the structure
was simply "any standard microprocessor base [sic]
gaming machine [with] appropriate programming.");
Harris Corp., 417 F.3d at 1253-54 (system implemented

by a microprocessor programmed to handle distortion of wireless signals using a "time domain processing means for simulating the time domain effect of said dispersive medium on signals . . . and for producing estimates of said information signals").

Those cases establish that disclosing a computer or a computer with "appropriate programming" as the structure designated to perform a function does not satisfy the requirements of § 112, ¶ 6. The specifications of the patents at issue in those cases identified only general purpose computers or microprocessors as the relevant structure without providing specifics as to the type of software running on the devices. Because general purpose computers and microprocessors can be programmed to perform any number of functions, a person skilled in the art reading the claims in view of the specification would not understand the metes and bounds of the claims. WMS Gaming and the cases citing to it sought to prevent this type of indefinite claiming that relied on the disclosure of an undefined computer algorithm.

Here, however, the specification of the '156
Patent does not point to some undefined software
implemented on a general purpose computer as the
corresponding structure for its functional claim
limitations. Rather, the specification describes
various types of modules and their equivalents as the
corresponding structure for the means limitations.
Numerous courts have previously found that in the
telecommunications field, a "module" is not a general
purpose computer. Rather, it is a special purpose
hardware device or software component, readily
identifiable to a person of skill in the art, and
which can serve as the corresponding structure for a
means plus function limitation. See Foundry Networks,
2005 U.S. Dist. LEXIS 46840, at *21, 22, 24, 25
("voice communication module"); Alcatel USA, 2008 U.S.
Dist. LEXIS 64351, at *52, 56, 60 ("locator module"
and "device module"); Roche Diagnostics, 455 F. Supp.
2d at 857 ("removable and/or read-only-memory . . .
module"); Visto Corp., 2008 U.S. Dist. LEXIS 3244, at
*32-34, 37 ("general synchronization module,"
"synchronization start module," and "communications
module"); Autobytel, 2006 U.S. Dist. LEXIS 3381, at
*24-26 ("process purchase request module," "database

access module," buyer-dealer association module," and
"network access module").

Moreover, not every patent that utilizes
computer processing power must disclose all the
algorithms utilized.  Courts have held that a specific
algorithm need not be disclosed to avoid
indefiniteness where the function in question would be
readily apparent to a person of skill in the art.  See
Aristocrat Techs. Austl. Pty Ltd., v. Multimedia
Games, Inc., No. 2007-1375, 2008 U.S. App. LEXIS 3774,
at *16 (Fed. Cir. Feb. 22, 2008) ("WMS Gaming, however
does not require that a particular algorithm be
identified if the selection of the algorithm or group
of algorithms needed to perform the function in
question would be readily apparent to a person of
skill in the art."); Med. Instrumentation, 344 F.3d at
1214 ("[T]here would be no need for a disclosure of
the specific program code if software were linked to
the converting function and one skilled in the art
would know the kind of program to use."); S3 Inc. v.
nVIDIA Corp., 259 F.3d 1364, 1371 (Fed. Cir. 2001)
("[T]he law is clear that patent documents need not
include subject matter that is known in the field of

the invention and is in the prior art, for patents are
written for persons experienced in the field of the
invention."); SPX Corp. v. Bartec USA, LLC, 557 F.
Supp. 2d 810, 819-20 (E.D. Mich. 2008) (extent of
algorithm requirement determined by knowledge of
ordinary skilled artisan).

Here, a caller ID detection module (or
originating telephone number module) performs the
well-known function of identifying the calling
telephone number.  Likewise, a telephone number
detection module performs the function of detecting
the dialed telephone number, an interface module
performs the function of receiving an incoming
telephone call, and a call connection module performs
the function of connecting telephone calls.  These
functions practiced by every telephone service
provider and are well known in the art.

The '156 Patent's module references would
convey to a person skilled in the art the structure
required for performing the claimed functions and
therefore the metes and bounds of the claim.  As a
result, the WMS Gaming line of cases is inapplicable,

and the means limitations of the '156 Patent are not
indefinite.

## V.  CONCLUSION

For the foregoing reasons, Rebtel's motion
for summary judgment is denied, and the disputed claim
terms are given the definitions set forth in this
opinion.

It is so ordered.

**New York, NY**

December        ,  2009

ROBERT W. SWEET
U.S.D.J.
January 5, 2010